_____FILED_____ENTERED
_____LOGGED_____RECEIVED

OCT 0 8 2019

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY_____DEPUTY

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| IN THE MATTER OF THE: | ) | UNDER SEAL **19 - 3 2 8 4  ADC** |
| | ) | |
| **Criminal Complaint for Russell Stanley III,** | ) | CASE NO. _____ |
| **Zakiyya Holloman, Maurice Vaughn,** | ) | |
| **and Delonte Andre Gomez** | ) | *thru* |
| | ) | |
| **Search of 12026 Hallandale Terrace** | ) | **19 - 3 2 8 8  ADC** |
| **Bowie, Maryland 20721** | ) | CASE NO. _____ |

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT, ARREST WARRANTS, AND THE SEARCH AND SEIZURE WARRANT

Your Affiant, Douglas Henegar, being first duly sworn, hereby depose and state as follows:

1.      Your Affiant makes this Affidavit in support of a criminal complaint and arrest warrants for Russell Stanley III ("**STANLEY**"), Zakiyya Holloman ("**HOLLOMAN**"), Maurice Vaughn ("**VAUGHN**"), and Delonte Andre Gomez ("**GOMEZ**") (collectively referred to as the "**TARGET SUBJECTS**").

2.      Your Affiant also makes this Affidavit in support of search and seizure warrant for 12026 Hallandale Terrace, Bowie, Maryland 20721, as fully described in Attachment A (the "**Target Location**").

3.      Your Affiant submits that probable cause exists to believe that the **TARGET SUBJECTS** are engaging in drug trafficking activities in violation of 21 U.S.C. §§ 841(a)(1), 843(b), and 846; and **STANLEY** and **GOMEZ** are using the **Target Location** in furtherance of drug trafficking activities.

### Affiant's Background

4.      Your Affiant is an "investigative or law enforcement officer . . . of the United States" within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18

U.S.C. § 2516.

5.　　Your Affiant has been a United States Postal Inspector since April 2012 and is currently assigned to the United States Postal Inspection Service ("USPIS") Narcotics Team. As a United States Postal Inspector, your Affiant routinely investigates the use of the United States mail to ship narcotics and narcotics proceeds from source areas, such as Florida, Georgia, California, Arizona, Texas and Colorado, to the Baltimore/Washington, D.C. area and vice-versa.

6.　　In particular, your Affiant has participated in numerous drug trafficking investigations during which he conducted or participated in surveillance of drug dealers and others involved in drug trafficking; listened to hundreds of court-authorized intercepted phone calls between individuals involved or suspected to be involved in drug trafficking activities; made undercover purchases of drugs from drug dealers; applied for and executed arrest and search warrants; seized evidence relating to drug trafficking, including substantial quantities of narcotics, drug proceeds, and drug paraphernalia. In addition, your Affiant has worked directly with confidential informants and sources to conduct controlled drug purchases; debriefed them; and interviewed drug dealers and users about their lifestyles, appearances, and habits. Moreover, your Affiant has reviewed taped conversations, documents, and other records relating to drug trafficking and money laundering, including, but not limited to, buyers and sellers lists and owe sheets or drug ledgers.

7.　　Based on your Affiant's training and experience as a United States Postal Inspector, your Affiant can identify various methods that drug traffickers regularly use to facilitate the shipment of controlled substances and bulk cash through the United States mail. Specifically, your Affiant is aware that narcotic traffickers regularly use Priority Mail Express and Priority Mail

2

services to ship controlled substances and bulk cash through the United States mail. Priority Mail Express labels have multi-layered carbon copies: The top copy with original writing is always kept at the local post office; a second copy is given to the customer as a receipt; and a carbon copy stays on the parcel.

8.     Prior to being a United States Postal Inspector, your Affiant was a United States Federal Air Marshall for ten (10) years. In that role, your Affiant primarily worked as a covert law enforcement officer protecting aircraft passengers and infrastructure from terrorist threats as well as preventing the use of the airplane as a weapon of mass destruction.

9.     Before his 10-year tenure as a United States Federal Air Marshall, your Affiant served a one-year stint as a United States Bureau of Customs and Border Protection patrol officer. In that capacity, your Affiant participated in alien-smuggling and drug interdictions at the southwest border of the United States.

10.     Based on your Affiant's training, knowledge, and experience, he has become familiar with the following: (1) the manner in which drug traffickers (a) transport, store, and distribute drugs, (b) collect, keep, and conceal the proceeds of their illegal activities; and (2) the ways in which drug traffickers (a) use cellular telephones, cellular telephone technology, coded communications or slang during drug-related conversations, and (b) other means to facilitate their illegal activities and thwart law enforcement investigations.

11.     Specifically, based on your Affiant's training, knowledge, and experience, your Affiant has learned the following:

        a.  Controlled dangerous substances ("CDS") trafficking is an ongoing and recurring criminal activity. As contrasted with crimes against persons, which tend to be discrete offenses, CDS trafficking is an illicit commercial

3

activity that is characterized by regular, repeated criminal activity.

b. CDS traffickers commonly compartmentalize members of their organization into discrete "cells," with specific members, responsibilities, and/or geographical territories assigned to each cell, and members of one cell commonly receive information only about that specific cell's criminal activities. Consequently, this limitation of information frustrates law enforcement efforts to dismantle the entire organization.

c. Cellular telephones are indispensable tools of the CDS trafficking trade. CDS traffickers use cellular telephones, push-to-talk telephones, Short Message Service ("SMS"), electronic mail, and other, similar electronic means and/or devices to maintain contact with co-conspirators and other CDS traffickers.

d. When collusive United States Postal Service ("USPS") employees divert parcels, those USPS employees typically receive direction from an outside handler and use their issued electronic parcel scanner to manipulate parcel scan times and locations to avoid detection by the USPS and law enforcement.

e. CDS traffickers often maintain a supply of illegal drugs, items used in the manufacturing, packaging, transportation of illegal drugs, and drug proceeds inside of their residences and stash locations.

f. CDS traffickers conceal contraband related to illicit activities—such as scales, packaging material, cutting agents, vacuum sealers, and other containers—in locations where they can readily access them, such as their residences, the residences of their friends, family members, and associates, or their drug distribution locations, such as a stash house.

g. CDS traffickers maintain books, records, receipts, notes, ledgers, bank records, money orders, and other papers relating to the importation, manufacture, transportation, ordering, sale, and distribution of CDS for long periods of time in their residence, the residences of their friends, family members, and associates, or their drug distribution locations. This documentary evidence includes, but is not limited to, telephone numbers, telephone books, address books, credit card and hotel receipts, plane and bus tickets and receipts, car rental receipts, passports, accounts and records in fictitious names, false identification, money orders, cashier's checks relating to cash transactions and records indicating the existence of storage facilities used in narcotics trafficking. Indicia of occupancy, residency and/or ownership of the premises to be searched are often present in such premises.

4

h. CDS traffickers take, or cause to be taken, photos of themselves, their associates, their property, and illegal contraband. CDS traffickers usually maintain these photos in their residence; the residences of their friends; family members or associates; or their drug distribution locations, such as a stash house.

i. CDS traffickers use rental vehicles to make it difficult for law enforcement to conduct surveillance of CDS traffickers.

12.    Additionally, based on your Affiant's training, knowledge, and experience, he knows that there are suspicious characteristics common to many packages that contain narcotics, controlled substances, or the proceeds thereof (*i.e.* United States currency), and the USPIS uses such characteristics to identify packages requiring further investigation. The most common suspicious characteristics routinely observed in the course of screening packages are as follows:

a. As an alternative to First Class Mail, which does not provide a customer with the capability to track the progress of a parcel through the system, the USPS offers Priority Mail Express and Priority Mail services. The Priority Mail Express service guarantees the delivery of the customer's package on a set date and time determined at the time of mailing but that package is usually scheduled for overnight delivery. The customer receives a receipt containing the guaranteed delivery date along with a distinct Priority Mail Express tracking number and can opt for a signature requirement at the other end. The customer can track the parcel online by its distinct tracking number, and if the package is not delivered by the promised time, the customer is entitled to a refund for the mailing cost of that package. Unlike the Priority Mail Express service, the Priority Mail service has a delivery standard of one to three business days, and delivery within that time period is not guaranteed. Although the Priority Mail service is a less expensive alternative to the Priority Mail Express service, the Priority Mail service still provides tracking capabilities. In your Affiant's experience, it is fairly easy to separate out smaller parcels, which constitute 70% to 80% of all Priority Mail Express and Priority Mail parcels, from other heavier parcels. Legitimate businesses using the Priority Mail Express and Priority Mail services typically have a business or corporate account visible on the mailing labels with typewritten addresses, which cover the mailing cost of those parcels. Priority Mail Express parcels shipped by legitimate businesses typically weigh no more than eight (8) ounces, and Priority Mail parcels shipped by the same, typically weigh no more than two (2) pounds.

In contrast, a drug distributor will pay for the mailing cost of a package containing drugs or drug proceeds at the counter by using cash or a credit card. Drug packages usually exceed the typical weights of Priority Mail Express and Priority Mail shipped by legitimate businesses, and the mailing labels on the drug packages are typically hand written. Typically, CDS traffickers use Priority Mail Express and will opt out of the requirement of obtaining a signature upon delivery.

b.  Invalid Sender/Return Address: When CDS traffickers ship drugs through the mail, the senders generally do not want the drugs back. To distance themselves from parcels containing drugs, the CDS traffickers often list fictitious or false return addresses and names of senders. A fictitious or false address is anything from an incorrect zip code to a non-existent house number or street. Likewise, the senders' names are sometimes names of celebrities, cartoon characters, or fictional names. More often, a search of a law enforcement database reflects that there is no association between the name of the sender and the address provided.

c.  Invalid Recipient/Address: While putting the wrong receiving address on a package would be counter-productive, the named recipient often is not associated with the receiving address. Consequently, the intended recipient of the package can claim that he did not know about its contents. CDS traffickers sometimes address drug packages to vacant properties with the expectation that the postal carrier will leave them at the receiving address. The intended recipient of packages containing drugs or proceeds of the same will then retrieve them from that location and hope to remain anonymous.

d.  Location of Sender: Packages shipped to or from narcotics source states, such as Arizona, California, Texas, Washington, Colorado, and Florida, or territories, such as Puerto Rico, can also signify that the parcels contain controlled substances or the proceeds thereof.

e.  Smell: The odors of cocaine, marijuana, and methamphetamine are distinct, and postal inspectors are familiar with these odors from experience. On occasion, a parcel will emit an odor that is easily recognized without the assistance of a canine. Other smells suggesting that a parcel may contain narcotics include the aroma of masking agents. Among the common masking agents used to thwart law enforcement detection are dryer sheets, coffee, and mustard.

f.  Heavy Taping/Excessive Glue: CDS traffickers heavily tape or use excessive glue on narcotics parcels in an effort to keep the smell inside and forestall easy checking on the interior contents by lifting up a flap.

g.  Click-N-Ship: The USPS created Click-N-Ship as a service for frequent mailers and businesses who prefer printing address labels and purchasing postage from their residences or businesses. CDS traffickers create Click-N-Ship accounts as a means of giving a legitimate appearance to their drug mailings. They create the accounts using fictitious account information and often provide pre-paid credit cards as forms of payment, which are difficult for law enforcement to track. CDS traffickers often use legitimate business return addresses in states other than California and Arizona as a means to deter detection, as states other than California and Arizona are not considered "source states."

## Basis of Information

13.     The facts set forth in this Affidavit are based upon your Affiant's (1) personal knowledge, (2) review of documents and other evidence related to this investigation, and (3) communication with others who have personal knowledge of the events and circumstances described herein (4), as well as information that your Affiant gained through training and experience. Because your Affiant submits this Affidavit for the limited purpose of establishing probable cause for the requested tracking warrant, he has not included every detail of this investigation. Rather, your Affiant has included in this Affidavit only those facts that are sufficient to support a probable cause finding for the issuance of the requested tracking warrant.

## Probable Cause

### *New York Package 1*

14.     On February 28, 2018, New York Postal Inspectors learned about numerous USPS Priority Mail parcels suspected to contain CDS based on suspicious characteristics common to packages that contain CDS. Among those parcels was the Priority Mail parcel destined to an address in Rochester, New York, with the following characteristics: (1) a post office box in Puerto Rico as the return address; (2) the addresses were written in heavy black magic marker; (3) no association between the sender's and recipient's names and their listed addresses; and (4) weighing

7

approximately 12 lbs. (hereinafter referred to as "**New York Package 1**").

15.     On March 3, 2018, New York Postal Inspectors removed **New York Package 1** from the mail stream. On March 20, 2018, a New York State Police trooper used standard protocol for canine detection to determine whether there was probable cause that **New York Package 1** contained narcotics. The narcotic detection canine, Mic, alerted to the presence of narcotics in **New York Package 1**.

16.     On March 21, 2018, United States Magistrate Judge Jonathan W. Feldman of the Western District of New York issued a search warrant for **New York Package 1**. On the same day, Postal Inspectors recovered two bricks consisting of compressed white powder that field-tested positive for cocaine and weighing approximately two (2) kilograms from inside **New York Package 1**.

*Florida Package*

17.     On August 8, 2018, Maryland Postal Inspectors identified Priority Mail parcel destined to an address in Kissimmee, Florida, with the following characteristics:  (1) a return address in Puerto Rico; (2) no association between the sender's and recipient's names and their listed addresses; (3) the addresses were written in heavy black magic marker; and (4) weighed approximately 7 lbs and 9 oz (hereinafter referred to as "**Florida Package**").

18.     Per your Affiant's request, Florida Postal Inspectors removed the **Florida Package** from the mail stream in Florida upon its arrival from Puerto Rico on August 10, 2018. Shortly after, Florida Postal Inspectors transferred the **Florida Package** to the incoming mail facility in Linthicum Heights, Maryland, where your Affiant's office is located. On August 14, 2018, a Montgomery County (Maryland) Police detective, one of the local law enforcement partners that

USPIS frequently uses for narcotic detection, used standard protocol for canine detection to determine whether there was probable cause that the **Florida Package** contained narcotics. The narcotic detection canine, Riggs, alerted to the presence of narcotics in the **Florida Package**.

19.     On August 15, 2018, United States Magistrate Judge A. David Copperthite of the District of Maryland issued a search warrant for the **Florida Package**. On the same day, Postal Inspectors executed that search warrant and recovered two compressed bricks consisting of compressed white powder and weighing approximately two (2) kilograms. The laboratory results confirmed that those bricks contained cocaine.

*New York Package 2*

20.     On February 9, 2019, New York Postal Inspectors identified Priority Mail parcel destined to an address in Rochester, New York, with the following characteristics: (1) a return address in Puerto Rico; (2) no association between the sender's and recipient's names and their listed addresses; (3) the addresses were written in heavy black magic marker; and (4) weighed approximately 14 lbs and 1 oz (hereinafter referred to as "**New York Package 2**").

21.     On February 11, 2019, New York Postal Inspectors removed **New York Package 2** from the mail stream. On February 11, 2019, a New York State Police Trooper used standard protocol for canine detection to determine whether there was probable cause that **New York Package 2** contained narcotics. The narcotic detection canine, Rog, alerted to the presence of narcotics in **New York Package 2**.

22.     On February 13, 2019, United States Magistrate Judge Miriam W. Parson of the Western District of New York issued a search warrant for **New York Package 2**. On the same day, Postal Inspectors recovered two bricks consisting of compressed white powder and weighing

9

approximately two (2) kilograms from inside **New York Package 2.** The laboratory results confirmed that those bricks contained cocaine.

*Subject Parcels*

23.     Based on evidence gathered to date, investigators believe that **STANLEY**'s drug trafficking organization ("**STANLEY DTO**") includes collusive USPS letter carriers and others who divert the parcels containing cocaine to **STANLEY**: (1) **HOLLOMAN**, a USPS letter carrier who is assigned to Postal Rural Route 022, (2) **VAUGHN**, a USPS letter carrier assigned to Postal City Route 022; and (3) **GOMEZ**, a **STANLEY DTO** runner.

24.     Based on your Affiant's training, knowledge, and experience, your Affiant believes that the United States parcels as fully described in Attachment B (hereinafter "**Subject Parcels**") are associated with the **Florida Package, New York Package 1, and New York Package 2.** Specifically, the **Subject Parcels** have the following similarities to the **Florida Package, New York Package 1 and New York Package 2**: addresses in heavy black magic marker, similar handwriting, no association between the senders' and recipients' names and their listed addresses, and Puerto Rico as the place the packages entered the mail stream. Additionally, the **Subject Parcels** have recycled street names for some listed senders' addresses.

25.     Postal Inspectors suspect that the **Subject Parcels** contained the aggregate of multiple kilograms of cocaine, because the **Florida Package, New York Package 1, and New York Package 2** (a) have the same characteristics as the **Subject Parcels** and (b) contained two bricks consisting of compressed white powder that field-tested positive for cocaine.

10

26.    The following paragraphs contain examples of the **STANLEY DTO**'s illicit activities:

*Subject Parcel 1*

27.    On October 12, 2018, Maryland Postal Inspectors identified a Priority Mail parcel destined to 15003 Ridge Chase Ct., Bowie, MD 20715, with the following characteristics: (1) a return address in Puerto Rico; (2) no association between the names and addresses on the package; (3) the addresses were written in heavy black magic marker; and (4) weighing approximately twelve (12) lbs ("**Subject Parcel 1**").

28.    On October 13, 2018, Maryland Postal Inspectors conducted surveillance of **HOLLOMAN** regarding **Subject Parcel 1**. At approximately 12:58 p.m., **HOLLOMAN** drove United States Postal Service Long Life Vehicle No. 1264602 (hereinafter referred to as "**Postal Vehicle 1**") to Bowie Plaza located at 6908 Laurel Bowie Rd, Bowie, MD 20715 in Bowie, Maryland ("Bowie Plaza"). While there briefly, **HOLLOMAN** used the text-messaging feature on a cellular telephone. At approximately 1:08 p.m., **HOLLOMAN**, driving **Postal Vehicle 1**, arrived at the delivery address listed on **Subject Parcel 1** and scanned **Subject Parcel 1** as delivered. However, **HOLLOMAN**, seated in **Postal Vehicle 1**, handed **Subject Parcel 1** to **STANLEY**, standing outside **Postal Vehicle 1**, and received an unknown amount of United States currency from **STANLEY**. **HOLLOMAN** placed that United States currency on her person and left the area driving **Postal Vehicle 1** at a high rate of speed.

*Subject Parcel 2*

29.    On October 19, 2018, Maryland Postal Inspectors identified a Priority Mail parcel destined to 8220 River Park Rd. Bowie, MD 20715, with the following characteristics: (1) a return

address in Puerto Rico; (2) no association between the names and addresses on the package; (3) the addresses were written in heavy black magic marker; and (4) weighing approximately twelve (12) lbs ("**Subject Parcel 2**").

30.     On October 20, 2018, your Affiant conducted surveillance of **HOLLOMAN** regarding **Subject Parcel 2**. Your Affiant saw **STANLEY** driving a 2014 white Honda Crosstour bearing Maryland license plate number 5DD8233 ("**STANLEY's Second Vehicle**") in the 8200 block River Park Road in Bowie, Maryland, at approximately 12:14 p.m.; and parking in front of the delivery address listed on **Subject Parcel 2** at approximately 12:55 p.m.  At approximately 12:56 p.m., **HOLLOMAN** entered the area, made a U-turn on River Park Road, and parked **Postal Vehicle 1** in front of **STANLEY's Second Vehicle**.  At approximately 12:57 p.m., (1) **STANLEY** (a) exited **STANLEY's Second Vehicle**, (b) retrieved a parcel from the driver side of **Postal Vehicle 1**, and (c) placed **Subject Parcel 2** in the trunk **STANLEY's Second Vehicle**; and (2) **HOLLOMAN** scanned **Subject Parcel 2** as delivered.

*Subject Parcel 3*

31.     On November 8, 2018, Maryland Postal Inspectors identified a Priority Mail parcel destined to 8221 River Park Rd. Bowie, MD 20715, with the following characteristics: (1) a return address in Puerto Rico; (2) no association between the names and addresses on the package; (3) the addresses were written in heavy black magic marker; and (4) weighing approximately fourteen (14) lbs ("**Subject Parcel 3**").

32.     On November 13, 2018, your Affiant conducted surveillance of **HOLLOMAN** regarding **Subject Parcel 3**. At approximately 12:03 p.m., **STANLEY** was driving a silver Nissan Pathfinder bearing Maryland tag number 9DG3296 registered to EAN Holdings LLC, 2273

Research Boulevard, Suite 600, Rockville, Maryland 20850 (hereinafter "**STANLEY's Third Vehicle**") in the parking lot of Bowie Plaza adjacent to the Bowie Main Post Office located at 6710 Laurel Bowie Road, Bowie, Maryland 20715; and using a cellular telephone when **STANLEY** parked **STANLEY's Third Vehicle** next to the `Affiant's vehicle. Based on your Affiant's training, knowledge, and experience, **STANLEY** drove **STANLEY's Third Vehicle** around the Bowie Plaza's parking lot to view the loading dock of the Bowie Main Post Office to determine whether law enforcement was surveilling **HOLLOMAN**.

33.     At approximately 2:11 p.m., **HOLLOMAN** parked at the delivery address listed on **Subject Parcel 3**, but she delivered two small, unassociated parcels to 8219 River Park Road, Bowie, Maryland 20715 and scanned **Subject Parcel 3** as delivered at approximately 2:13 p.m. However, **Subject Parcel 3** was still in **Postal Vehicle 1**. At approximately 2:17 p.m., **STANLEY** traveled toward Racetrack Road and ultimately turned onto Patuxent Riding Lane—a cul-de-sac, the same location to which **HOLLOMAN** drove **Postal Vehicle 1** at approximately 2:15 p.m. At approximately 2:23 p.m., **STANLEY** approached **HOLLOMAN** who was seated in **Postal Vehicle 1**. **HOLLOMAN** then handed **Subject Parcel 3** to **STANLEY**, standing outside **Postal Vehicle 1**, and received an unknown amount of United States currency from **STANLEY**. At approximately 2:25 p.m., **HOLLOMAN** placed that United States currency on her person and left the area driving **Postal Vehicle 1** at a high rate of speed and **STANLEY** left that area driving **Stanley's Third Vehicle** at a high rate of speed.

*Subject Parcel 4*

34.     On January 16, 2019, Maryland Postal Inspectors identified Priority Mail parcel destined to 13109 Ovalstone Ln. Bowie, MD 20715, with the following characteristics: (1) a return

13

address in Puerto Rico; (2) no association between the names and addresses on the package; (3) the addresses were written in heavy black magic marker; and (4) approximately twelve (12) lbs (hereinafter referred to as "**Subject Parcel 4**").

35.    On January 19, 2019, your Affiant conducted surveillance of **VAUGHN** regarding **Subject Parcel 4**. At approximately 12:12 p.m., the driver of a 2014 black Mercedes Benz E250 bearing Maryland tag number 5DD8233 but the Maryland Motor Vehicle Administration has no record of that tag number (hereinafter referred to as "**STANLEY's First Vehicle**") pulled next to **VAUGHN** and talked with **VAUGHN**. **VAUGHN** then stopped delivering mail and entered United States Postal Service Long Life Vehicle No. 8426946 (hereinafter referred to as "**Postal Vehicle 2**"); and drove to the delivery address listed on **Subject Parcel 4**. Instead of delivering **Subject Parcel 4**, **VAUGHN** stopped in front of the delivery address listed on **Subject Parcel 4** for approximately thirty (30) seconds, but **VAUGHN** neither exited **Postal Vehicle 2** nor delivered **Subject Parcel 4**. Nonetheless, **VAUGHN** scanned **Subject Parcel 4** as delivered at 12:13 p.m.

36.    On the same day, at approximately 12:20 p.m., **VAUGHN** used his hands to direct the drivers of **STANLEY's First Vehicle** and a green 2014 Mini Cooper bearing Maryland tag number 8DE2898 registered to Ekaila Edwards, 21803 Cherrywood Lane, Bowie, Maryland 20715 (hereinafter referred to as the "**green Mini Cooper**") toward Racetrack Road in Bowie. The drivers of **STANLEY's First Vehicle** and the **green Mini Cooper** left that area traveling together at a high rate of speed. Based on your Affiant's training, knowledge, and experience, he believes that the driver of the **green Mini Cooper** assisted the driver of **STANLEY's First Vehicle** with counter-surveillance as the driver of **STANLEY's First Vehicle** obtained **Subject Parcel 4** from **VAUGHN** or coordinated the delivery with **VAUGHN** of **Subject Parcel 4** to the driver of

14

**STANLEY's First Vehicle.**

*Subject Parcel 5*

37.     On February 13, 2019, Maryland Postal Inspectors identified Priority Mail parcel destined to 4403 Ockford Ln Bowie, MD 20715, with the following characteristics: (1) a return address in Puerto Rico; (2) no association between the names and addresses on the package; (3) the addresses were written in heavy black magic marker; and (4) approximately twelve (12) lbs (hereinafter referred to as "**Subject Parcel 5**").

38.     On February 15, 2019, your Affiant conducted surveillance of **VAUGHN** regarding **Subject Parcel 5**. At approximately 12:42 p.m., **STANLEY**, driving **STANLEY'S First Vehicle**, pulled behind **Postal Vehicle 2** in the 4400 block of Ockford Lane in Bowie. Although **VAUGHN** scanned **Subject Parcel 5** as delivered at approximately 12:46 p.m., **VAUGHN**, driving **Postal Vehicle 2**, and **STANLEY**, driving **STANLEY's First Vehicle**, turned onto Overbrook Lane; and **VAUGHN** removed a brown parcel from **Postal Vehicle 2** and placed it into the passenger side of **STANLEY's First Vehicle**. Shortly after, **STANLEY**, driving **STANLEY's First Vehicle**, left the area at a high rate of speed. At approximately 12:53 p.m. on the same day, investigators observed a brown box exit the passenger side window of **STANLEY's First Vehicle** in the area of the 1200 block of Chesswood Lane in Bowie, Maryland and confirmed that box was **Subject Parcel 5** without all of its contents based on the tracking number and the delivery address listed on **Subject Parcel 5**.

39.     **Subject Parcel 5** contained the same contents as **New York Package 2**—such as edible peanuts, blue-and-white drinking straws, styrofoam plates and cups—except, two bricks that field-tested positive for cocaine inside of tubberware.

*Subject Parcel 6*

40.     On March 5, 2019, Maryland Postal Inspectors identified a Priority Mail parcel destined to 13839 King Frederick Way, Upper Marlboro, Maryland 20772, with the following characteristics:  (1) a return address in Puerto Rico; (2) no association between the names and addresses on the package; (3) the addresses were written in heavy black magic marker; and (4) weighing approximately thirteen (13) lbs (hereinafter referred to as "**Subject Parcel 6**").

41.     On March 8, 2019, investigators conducted surveillance of **STANLEY** regarding **Subject Parcel 6.** Court-authorized location data for 240-475-0441, subscribed to Kaci Campbell, 10201 Martin Luther King Jr. Hwy. Bowie, MD 20720, but used by **STANLEY (STANLEY's Cell Phone**") reflected that **STANLEY's Cell Phone** was (1) present at or near the 13839 King Frederick Way during early morning hours on the same day, the delivery date of **Subject Parcel 6**; and (2) returned to 12606 Hallandale Terrace, Bowie, Maryland 20721 at approximately 6:00 a.m. that day.

42.     At 10:41 a.m., **STANLEY** exited **STANLEY's First Vehicle** and entered the delivery address listed on **Subject Parcel 6**.

43.     At 1:26 p.m., a USPS letter carrier delivered **Subject Parcel 6** to 13839 King Frederick Way.  At 1:29 p.m., **STANLEY** exited that address; walked to **STANLEY's First Vehicle**; placed two unknown objects into the trunk of **STANLEY's First Vehicle**; and drove **STANLEY's First Vehicle** at a high rate of speed when leaving that neighborhood.  Based on your Affiant's training, knowledge, and experience, you Affiant believes that **STANLEY** obtained **Subject Parcel 6** and conducted counter-surveillance as **STANLEY** left the area with **Subject Parcel 6.**

*Subject Parcel 7*

44.     On May 1, 2019 Maryland Postal Inspectors identified a Priority Mail parcel destined to 13821 King Frederick Way Upper Marlboro, MD 20772, with the following characteristics: (1) a return address in Puerto Rico; (2) no association between the names and addresses on the package; (3) the addresses were written in heavy black magic marker; and (4) approximately thirteen (13) lbs (hereinafter referred to as "**Subject Parcel 7**").

45.     On May 2, 2019, investigators conducted surveillance near the delivery address listed on **Subject Parcel 7**. At approximately 11:59 a.m., the court-authorized location data for **STANLEY's Cell Phone** reflected that **STANLEY's Cell Phone** was in the area one block from the delivery address listed on **Subject Parcel 7**. And at approximately the same time, **GOMEZ** (1) walked to the delivery address listed on **Subject Parcel 7**; (2) checked the doorstep of the residence; (3) then left that area; and (4) entered the rear of 13839 King Frederick Way, Upper Marlboro, Maryland 20772 ("13839 King Frederick Way").

46.     On the same day, at approximately 1:42 p.m., **GOMEZ** returned to the delivery address listed on **Subject Parcel 7**; and (2) a USPS letter carrier (a) passed **GOMEZ** in the front yard of the delivery address listed on **Subject Parcel 7**, (b) delivered **Subject Parcel 7** to the delivery address listed on **Subject Parcel 7**, (c) initiated a brief conversation with **GOMEZ**, and (d) pointed toward the area where the USPS letter carrier delivered **Subject Parcel 7**. **GOMEZ** then followed the USPS letter carrier to a United States Postal Service Long Life Vehicle (hereinafter referred to as "**Postal Vehicle 3**"); retrieved an unknown object from **GOMEZ's** right front pocket; and (c) appeared to hand the object to the USPS letter carrier. The USPS letter carrier, driving Postal Vehicle 3, then left that area at a high rate of speed.

17

47.     Shortly after, **GOMEZ** ran from the curb to the delivery address listed on **Subject Parcel 7**; retrieved **Subject Parcel 7** from the front steps of the delivery address listed on **Subject Parcel 7**; carried **Subject Parcel 7** to the rear entrance of 13839 King Frederick Way; and entered that residence.

48.     The court-authorized location data for **STANLEY's Cell Phone** reflected that for **STANLEY's Cell Phone** was heading toward the area of the delivery address listed on **Subject Parcel 7** at approximately 1:57 p.m., and **STANLEY's Cell Phone** was in the area of the delivery address listed on **Subject Parcel 7** at approximately 2:11 p.m.

49.     At 2:14 p.m., investigators observed a man drive a black Ford sedan into the area near the front of 13839 King Frederick Way; the black Ford sedan remain in front of 13839 King Frederick Way for approximately thirty (30) seconds; and the black Ford sedan's driver, accompanied by another male passenger, then leave the area of 13839 King Frederick Way at a high rate of speed. The black Ford sedan's occupants fit the descriptions of **STANLEY**, the driver, and **GOMEZ**, the passenger.

50.     Investigators later determined that, between April 29, 2019, and May 20, 2019, **STANLEY** rented a black Ford Focus bearing Maryland license tag number VZB4439— consistent with black Ford sedan that investigators had observed a man who fit **STANLEY**'s description driving on May 2, 2019, near 13839 King Frederick Way—from Enterprise Rent-A Car located at 9405 Lanham Severn Road, Seabrook, Maryland 20706.

*Subject Parcel 8*

51.     On June 12, 2019, Maryland Postal Inspectors identified Priority Mail parcel destined to 4100 Crosswick Ln Bowie, MD 20715, with the following characteristics: (1) a return

address in Puerto Rico; (2) no association between the names and addresses on the package; (3) the addresses were written in heavy black magic marker; and (4) approximately twelve (12) lbs (hereinafter referred to as "**Subject Parcel 8**").

52.     On June 13, 2019, your Affiant conducted surveillance near the delivery address listed on **Subject Parcel 8**. At approximately 11:26 a.m., **VAUGHN** drove United States Postal Service Long Life Vehicle No. 8426951 (hereinafter referred to as "**Postal Vehicle 4**") in the area of the 4200 block of Crosswick Turn. **VAUGHN** scanned **Subject Parcel 8** delivered at 12:05 p.m., however, **VAUGHN** did not deliver any parcels to 4100 Crosswick Turn on that day.

53.     On the same day, at approximately 12:55 p.m., **GOMEZ** parked a blue Subaru registered to Delonte Gomez, 12026 Hallandale Terrace, Bowie, Maryland 20721 ("**GOMEZ's Vehicle**") for a brief period in the area of the delivery address listed on **Subject Parcel 8** and then drove **GOMEZ's Vehicle** across Racetrack Road to the area of Overbrook Lane, where **VAUGHN**, in **Postal Vehicle 2**, was located. At approximately 1:01 p.m., **VAUGHN** exited **Postal Vehicle 2** and retrieved from the interior of **Postal Vehicle 2** a box matching **Subject Parcel 8**'s description. At approximately 1:04 p.m., **GOMEZ**, driving **GOMEZ's Vehicle**, left that area at a high rate of speed. Based on your Affiant's training, knowledge, and experience, he believes that **GOMEZ** obtained or received **Subject Parcel 8** from **VAUGHN** in the area of Overbrook Lane.

*Subject Parcel 9*

54.     On October 6, 2019, Maryland Postal Inspectors identified Priority Mail parcel destined to 13839 King Frederick Way, Upper Marlboro, MD 20772 with the following characteristics: (1) a return address in Puerto Rico; (2) no association between the sender's and

recipient's names and their listed addresses; (3) the addresses were written in heavy black magic marker; and (4) weighed approximately fifteen (15) lbs (hereinafter referred to as "**Subject Parcel 9**").

55.     On October 7, 2019, your Affiant removed **Subject Parcel 9** from the mail stream at the Incoming Mail Facility in Linthicum Heights, Maryland.  On the same day, a Montgomery County (Maryland) Police detective used standard protocol for canine detection to determine whether there was probable cause that **Subject Parcel 9** contained narcotics.   The narcotic detection canine, Riggs, alerted to the presence of narcotics in **Subject Parcel 9**.

56.     On October 7, 2019, Magistrate Judge Copperthite issued a search warrant for **Subject Parcel 9**.  On the same day, Postal Inspectors executed that search warrant and recovered two bricks consisting of compressed white powder that field-tested positive for cocaine and weighing approximately two (2) kilograms from inside **Subject Parcel 9.**

57.     **Subject Parcel 9** contained the same contents as **New York Package 2**, including, but not limited to, edible peanuts, blue-and-white drinking straws, styrofoam plates and cups, and two bricks that field-tested positive for cocaine inside of tubberware.

58.     **Subject Parcel 9** contained edible peanuts, blue-and-white drinking straws, and styrofoam plates and cups like **Subject Parcel 5** discussed supra in Paragraphs 37 to 39.

*Target Location 1*

59.     Based on investigators' surveillance during the course of this investigation as well as their training, knowledge, and experience, investigators identified the **Target Locations** as a stash house for the **STANLEY DTO**'s drugs, money, and contraband.

60.     Approximately twenty-three (23) minutes after **STANLEY** left the area where

20

**HOLLOMAN** handed **Subject Parcel 3** to **STANLEY** and received an and received an unknown amount of United States currency from **STANLEY** on November 13, 2018 as discussed supra at Paragraph 33, **STANLEY** drove **STANELY's Third Vehicle** into the area of **Target Location 1**.

61. Similarly, court-authorized location data for **STANLEY's Cell Phone** reflected that **STANLEY's Cell Phone** was also in the area of **Target Location 1** on May 2, 2019, approximately thirteen (13) minutes after the black Ford sedan's driver, who fit the description of **STANLEY**, accompanied by another male passenger, who fit the description of **GOMEZ**, left the area of 13839 King Frederick Way in the black Ford sedan at a high rate of speed less than not long since **GOMEZ** retrieved **Subject Parcel 7** from the front steps of the delivery address listed on **Subject Parcel 7** as discussed supra at Paragraphs 48-49.

62. Additionally, approximately nineteen (19) minutes after **GOMEZ** left the area where **VAUGHN** was located at a high rate of speed on June 13, 2019, as discussed supra at Paragraph 53; **GOMEZ** parked **GOMEZ's Vehicle** in front of **Target Location 1**; exited **GOMEZ's Vehicle**; retrieved a brown box similar to **Subject Parcel 8** from **GOMEZ's Vehicle's** trunk; and then entered **Target Location 1**.

63. On October 7, 2019, Maryland Postal Inspectors conducted a Maryland Motor Vehicle Administration check on **STANLEY** and **GOMEZ** and discovered that the **Target Location** is listed as **STANLEY's** and **GOMEZ's** residence.

64. Similarly, Maryland Postal Inspectors discovered that **STANLEY** is listed as the **Target Location's** owner, and the **Target Location** is listed as **STANLEY's** principal residence.

65. On June 25, 2019, investigators observed **STANLEY** enter the **Target Location**.

**STANLEY** retrieved a key from his pants pocket; used it to unlock the door to the **Target Location**; and entered the residence at approximately 4:21 p.m. that day.

66.     On June 25 2019, investigators observed **GOMEZ** exit the **Target Location** at approximately 1:33 p.m. and then re-enter the **Target Location** at approximately 2:28 p.m. **GOMEZ** retrieved a key from his pants pocket; used it to unlock the door to the **Target Location**; and entered the **Target Location**.

## Conclusion

67.     Based on the foregoing, your Affiant submits there is probable cause to believe that (i) the **TARGET SUBJECTS** are engaging in drug trafficking activities, in violation of 21 U.S.C. §§ 841(a)(1) and 846; (ii) **STANLEY** and **GOMEZ** are using the **Target Location** in furtherance of drug trafficking activities; (iii) and the **Target Location** contain fruits, evidence, and instrumentalities of drug trafficking activities.

68.     Accordingly, your Affiant respectfully requests the issuance of the requested criminal complaint and arrest warrants.  Your Affiant further requests search warrant for the **Target Location**, as fully described in Attachment A, for the items listed in Attachment C, which

constitute evidence, fruits, and instrumentalities of drug trafficking activities in violation of 21

U.S.C. §§ 841(a)(1), 843(b), and 846; and the seizure of the items listed in Attachment C.

Douglas Henegar
Postal Inspector
United States Postal Inspection Service

Subscribed and sworn before me this _8th_ day of October, 2019.

Honorable A. David Copperthite
United States Magistrate Judge

23

## Attachment A: The Target Location

The property to be searched is 12026 Hallandale Terrace, Bowie, Maryland 20721 (hereinafter referred to as the "**Target Location**"), the current address for Russell Stanley III and Delonte Andre Gomez. The **Target Location** is described as follows: an attached two-story wood-framed townhouse with light colored vertical wood shingles that run up the face of the structure on the front of the residence and a white threshold door covered by a white storm door.

A photograph of the Target Location is as follows:



**Attachment B: SUBJECT PARCELS**

| Subject Parcel | Priority Mail Tracking Number | From: Name and Address | To: Name and Address | Handwritten or Typed Label | Weight |
|---|---|---|---|---|---|
| 1. | 950551097718 8284252091 | [Parcel Image Obscured] Mayaguez, PR | Taylor Olson 15003 Ridge Chase Ct. Bowie, MD 20715 | Handwritten | 11bs 8 ozs. |
| 2. | 950551097718 8291254538 | Nelson Alers C-7 Miosotis URB Jardines Del Caribe Mayaguez, PR 00680 | Sully Oliver 8220 River Park Rd. Bowie, MD 20715 | Handwritten | 12 lbs 0 ozs |
| 3. | 950551097718 8312261897 | Frank Fernandez #8 Jose Padilla El Seco Mayaguez, PR 00680 | Debra Robinson 8221 River Park Rd. Bowie, MD 20715 | Handwritten | 14lbs 4 ozs |
| 4. | 950551097717 9016263904 | [No Image Available]* Mayaguez, PR 00682 | [No Image Available]** 13109 Ovalstone Ln. Bowie, MD 20715 | Handwritten | 11 lbs 15 ozs |
| 5. | 950551145413 9043194955 | [No Image Available]* Mayaguez, PR 00680 | [No Image Available]** 4403 Ockford Ln Bowie, MD 20715 | Handwritten | 11.5 lbs |
| 6. | 950551145414 9064209798 | [No Image Available]* Mayaguez, PR 00680 | [No Image Available]** 13839 King Frederick Way Upper Marlboro, MD 20772 | Handwritten | 13 lbs 0 ozs |
| 7. | 950551145415 9120221893 | Raymond Cardona #75 Enrique Simon Buena Vista Mayaguez, PR 00680 | Danielle Daley 13821 King Frederick Way Upper Marlboro, MD 20772 | Handwritten | 12 lbs 9 ozs |

| 8. | 950551145413<br>9162221457 | [No Image Available]*<br>Mayaguez, PR 00680 | [No Image Available]**<br>4100 Crosswick Turn Bowie, MD 20715 | Handwritten | 12 lbs<br>1 oz |
|---|---|---|---|---|---|
| 9. | 950551613377<br>9278325523 | Carmen Godoy<br>Com Stella #7 BZN 3193<br>Rincon, PR 00677 | Mystic Gooden<br>13835 King Frederick Way<br>Upper Marlboro, MD 20772 | Handwritten | 14lbs<br>15 ozs |

•One may not see (or see clearly) the name(s) and/or address(es) of the sender(s).
** One may not see or see clearly the name(s) of the recipient(s).

## Attachment C: Items to be Seized From the Target Location

This warrant authorizes the search and seizure of all records relating to the violations of 21 U.S.C. §§ 841, 843(b), and 846, by Russell Stanley III, Delonte Andre Gomez, and their known and unknown co-conspirators, including, but not limited to, the following:

1.      Controlled substances, including, but not limited to, cocaine.

2.      Drug paraphernalia, including but not limited to scales, plastic bags, drug wrappers, chemical test kits, metal pressing devices used for compressing cocaine and other controlled substances, masking and cutting agents, and scales.

3.      All materials used in the packaging of controlled substances in the United States mail, including boxes, padding, and other packaging materials.

4.      Documents, books, and papers reflecting names, addresses and/or telephone numbers of co-conspirators, customers, and suppliers, including, but not limited to, address books, telephone books, telephone bills and records.

4.      Books, records, receipts, notes, ledgers, diaries, journals, designated codes and other papers relating to the importation, transportation, purchase, sale and distribution of controlled substances.

5.      All records concerning travel, including but not limited to, itineraries, passports, visas, airline tickets, boarding passes, airline receipts, rental vehicle receipts; and hotel receipts.

6.      Books, records, receipts, bank statements and records, other financial statements, money drafts, letters of credit, money orders and cashier checks, passbooks, bank checks, credit card statements, employment or payment records, loan applications and records, real estate records, real estate rental agreements, property deeds, vehicle titles, and any other items evidencing the obtaining, secreting, transfer, and concealment of assets and expenditure of money.

7.      Indicia of occupancy, residency, and ownership of 12026 Hallandale Terrace, Bowie, Maryland 20721, including but not limited to, utility and telephone bills, correspondence, and keys.

8.      Safe deposit box keys, safe deposit box documents, storage unit documents, safe combinations, storage unit keys, records and agreements for payment, and other documents and items evidencing the obtaining, secreting, holding, transfer, and/or concealment of controlled substances.

9.      United States currency, bitcoins, precious metals, jewelry, and financial

instruments, including, but not limited to, stocks and bonds.

10.     Photographs, in particular, photographs of co-conspirators, controlled substances, sums of money, vehicles, jewelry, and/or assets.

11.     Locked or closed containers, boxes, receptacles that contain any of the items listed in Nos. 1 – 10 of this attachment.

12.     Locked or unlocked safes (and law enforcement officers may drill the same).

13.     Cellular telephones and related records; pagers and personal digital assistants and the numbers stored inside those devices; and devices capable of recording incoming telephone numbers and the numbers stored within those devices.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (*e.g.*, hard disks or other media that can store data); any handmade form (*e.g.*, writing); any mechanical form (*e.g.*, printing or typing); and any photographic form (*e.g.*, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).